UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION

This document relates to:

MDL No. 2804

Master Docket No. 1:17-MD-02804-DAP

RACHEL WOOD, INDIVIDUALLY AND AS NEXT FRIEND AND GUARDIAN OF MINOR O.W., AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Hon. Judge Dan A. Polster

Plaintiffs,

v.

PURDUE PHARMA L.P.;
PURDUE PHARMA, INC.;
THE PURDUE FREDERICK COMPANY, INC.;
MCKESSON CORPORATION;
CARDINAL HEALTH, INC.;
AMERISOURCEBERGEN CORPORATION;
TEVA PHARMACEUTICAL INDUSTRIES, LTD.;
TEVA PHARMACEUTICALS USA, INC.;
CEPHALON, INC.;
JOHNSON & JOHNSON;
JANSSEN PHARMACEUTICALS, INC.;
ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.;
JANSSEN PHARMACEUTICA INC. n/k/a JANSSEN PHARMACEUTICALS, INC.;
ENDO HEALTH SOLUTIONS INC.;
ENDO PHARMACEUTICALS, INC.;
ALLERGAN PLC f/k/a ACTAVIS PLC;
WATSON PHARMACEUTICALS, INC. n/k/a ACTAVIS, INC.;
WATSON LABORATORIES, INC.;
ACTAVIS LLC; and
ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.;
DEPOMED, INC.;
MALLINCKRODT LLC;
MALLINCKRODT PLC;
SPECGX LLC;

CLASS ACTION COMPLAINT
JURY TRIAL DEMANDED

**INSYS THERAPEUTICS, INC.;**
**PAR PHARMACEUTICAL, INC.;**
**PAR PHARMACEUTICAL COMPANIES, INC.;**
**NORAMCO, INC.;**
**INDIVIOR, INC.;**
**CVS HEALTH CORPORATION;**
**RITE AID OF MARYLAND, INC.;**
**RITE AID CORP.;**
**WALGREENS BOOTS ALLIANCE, INC.;**
**WALGREEN EASTERN CO.;**
**WALGREEN CO.;**
**WAL-MART INC. f/k/a WALMART STORES, INC.;**
**MIAMI-LUKEN, INC.;**
**COSTCO WHOLESALE CORPORATION;**
**LINDEN CARE, LLC;**
**THE KROGER CO.;**
**H.D. SMITH, LLC;**
**H.D. SMITH HOLDINGS, LLC;**
**H.D. SMITH HOLDING COMPANY;**
**ANDA, INC.;**
**RICHARD S. SACKLER;**
**JONATHON D. SACKLER;**
**MORTIMER D.A. SACKLER;**
**KATHER A. SACKLER;**
**ILENE SACKLER LEFCOURT;**
**BEVERLY SACKLER;**
**THERESA SACKLER;**
**DAVID A. SACKLER;**
**RHODES TECHNOLOGIES;**
**RHODES TECHNOLOGIES INC.;**
**RHODES PHARACEUTICALS L.P.;**
**RHODES PHARMACEUTICALS INC.;**
**TRUST FOR THE BENEFIT OF MEMBERS OF THE RAYMOND SACKLER FAMILY;**
**THE P.F. LABORATORIES, INC.**

**Defendants.**

**Case No. 1:18-op-45264**

---

**SUPPLEMENTAL AND AMENDED CLASS ACTION COMPLAINT**

---

Plaintiff submits this Supplemental and Amended Complaint incorporating as if fully set

forth herein its own prior pleadings.

## INCORPORATION BY REFERENCE OF EXISTING COMPLAINT

A1. Plaintiff's existing complaint is expressly incorporated by reference to this Supplemental and Amended Complaint.

A2. The purpose of this Supplemental and Amended Complaint is to add defendants not named in the existing Complaint (Doc. # 1), to provide factual allegations supporting the claims against these additional defendants, and to provide additional factual allegations against all Defendants.

A3. Plaintiffs and class representatives have sought state-wide ARCOS data from the PEC applicable to this state-wide class action but are still in talks with the PEC and have yet to receive it. Therefore, Plaintiffs reserves the right to amend this complaint to add additional defendants upon receipt and review of the relevant ARCOS data.

A4. The new defendants added through this Supplemental and Amended Complaint are included in the categories of Pharmaceutical and Distributor Defendants, respectively, set forth in the existing complaint. All allegations applicable to these categories of defendants apply to the new defendants named in those categories here.

## PARTIES – ADDITIONAL DEFENDANTS

A5. In addition to those defendants identified as parties in Plaintiff's existing complaint, Plaintiffs assert claims against the following additional parties as set forth below:

### A. Additional Pharmaceutical Defendants (Manufacturing and Marketing)

A6. Defendant DEPOMED, INC. ("**Depomed**") is a California corporation with its principal place of business in Newark, California. Depomed describes itself as a specialty pharmaceutical company focused on pain and other central nervous system conditions. Depomed develops, markets, and sells prescription drugs in Missouri and nationally. Depomed acquired the

rights to Nucynta and Nucynta ER for $1.05 billion from Janssen pursuant to a January 15, 2015 Asset Purchase Agreement. This agreement closed on April 2, 2015.

A7. Defendant Mallinckrodt LLC is a Delaware corporation with its headquarters in Hazelwood, Missouri. Defendant Mallinckrodt plc is an Irish public limited company with its headquarters in Staines-Upon-Thames, Surrey, United Kingdom. Mallinckrodt plc was incorporated in January 2013 for the purpose of holding the pharmaceuticals business of Covidien plc, which was fully transferred to Mallinckrodt plc in June of that year. Mallinckrodt is engaged in the manufacture, promotion, distribution, and sale of opioids such as Roxicodone, Exalgo, Xartemis XR, as well as oxycodone and other generic opioids. MPLC also operates under the registered business name Mallinckrodt Pharmaceuticals ("MPMO"), with its U.S. headquarters in Hazelwood, Missouri. Defendant SpecGx LLC is a Delaware limited liability company with its headquarters in Clayton, Missouri and is a wholly-owned subsidiary of Mallinckrodt plc. Mallinckrodt plc, Mallinckrodt LLC, and SpecGx LLC and their DEA registrant subsidiaries and affiliates (together, "**Mallinckrodt**") manufacture, market, sell and distribute pharmaceutical drugs throughout the United States. Mallinckrodt is the largest U.S. supplier of opioid pain medications and among the top ten generic pharmaceutical manufacturers in the United States, based on prescriptions.

A8. Defendant Insys Therapeutics, Inc. ("**Insys**") is a Delaware corporation with its principal place of business in Chandler, Arizona. Insys develops, markets, and sells prescription drugs, including Subsys, a sublingal spray of fentanyl, in, upon information and belief, Plaintiffs' counties and nationally. Subsys is a highly addictive mouth spray approved for use in cancer patients who are tolerant of other opioids. In 2016, Subsys had a 42% market share of transmucosal immediate-release fentanyl, which generated $300 million in annual U.S. sales for the company. Only 1% of Subsys sales have been generated by oncologists.

A9. Defendant Par Pharmaceutical, Inc. is a New York corporation with its principal

place of business located in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a wholly-owned subsidiary of Par Pharmaceutical Companies, Inc. f/k/a Par Pharmaceutical Holdings, Inc. Defendant Par Pharmaceuticals Companies, Inc. is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York (Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. are referred to collectively as "**Par Pharmaceutical**"). Par Pharmaceutical is an affiliate of Defendants Endo Health Solutions Inc. ("EHS") and Endo Pharmaceuticals, Inc. ("EPI). EHS, EPI, and Par Pharmaceutical, and their DEA registrant subsidiaries and affiliates (collectively, "Endo"), manufacture opioids sold throughout the United States including in Missouri.

A10. Defendant Noramco, Inc. ("**Noramco**") is a Delaware company headquartered in Wilmington, Delaware and was a wholly owned subsidiary of J&J and its manufacturer of active pharmaceutical ingredients until July 2016 when J&J sold its interests to SK Capital.

A11. Defendant Invidior, Inc. ("**Invidior**") is a Delaware domestic corporation with its principal place of business in Richmond, Virginia. Indivor manufactures and distributes buprenorphine-based prescription drugs for treatment of opioid dependence. Buprenorphine is a Schedule III drug. The company offers medication under the brand name Suboxone and sublingual tablets under the brand name Subutex. Indivor, Inc. is a subsidiary of Indivor, PLC, based in the United Kingdom. Indivor, Inc. was formerly known as Reckitt Benckiser Pharmaceuticals, Inc. Indivor, Inc. has manufactured and/or labeled Buprenorphine shipped to Missouri.

**B. Additional Distributor Defendants**

A12. Defendant CVS Health Corporation ("**CVS**") is a Delaware corporation with its principal place of business in Rhode Island. CVS, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. CVS also operates retail stores in numerous States, including in Missouri, that sell prescription medicines, including opioids. At all times relevant to this Amended Complaint, CVS distributed prescription opioids and engaged

in the retail selling of opioids throughout the United States, including in Missouri.

A13. Defendant Rite Aid of Maryland, Inc., dba Rite Aid Mid-Atlantic Customer Support Center, Inc. is a Maryland corporation with its principal offices located in Lutherville Timonium, Maryland. Defendant Rite Aid Corp. is a Delaware corporation with its principal offices located in Camp Hill, Pennsylvania. Together, Rite Aid of Maryland, Inc. and Rite Aid Corp. are referred to as "**Rite Aid**."

A14. Rite Aid, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. Rite-Aid also operates retail stores, including in Missouri, that sell prescription medicines, including opioids. At all times relevant to this Complaint, Rite Aid, through its various DEA registered subsidiaries and affiliated entities, distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in Missouri.

A15. Defendant Walgreens Boots Alliance, Inc., is a Delaware corporation with its principal place of business in Illinois. Defendant Walgreen Eastern Co. is a subsidiary of Walgreens Boots Alliance, Inc. that is engaged in the business of distributing pharmaceuticals, including prescription opioids. Defendant Walgreen, Co. is a subsidiary of Walgreens Boots Alliance that operates retail drug stores. Together, Walgreens Boots Alliance, Inc., Walgreen Eastern Co. and Walgreen Co. are referred to as "**Walgreens**."

A16. Walgreens, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. At all relevant times, Walgreens has sold and continues to sell prescription opioids in close proximity to the hospitals, clinics, and other healthcare facilities serving the state of Missouri.

A17. Defendant Wal-Mart Inc. f/k/a Walmart Stores, Inc. ("**Wal-Mart**"), is a Delaware corporation with its principal place of business in Bentonville, Arkansas. Walmart, through its

various DEA registered affiliated entities, conducts business as a licensed wholesale distributor. At all times relevant to this Amended Complaint, Wal-Mart distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in Missouri.

A18. Defendant MIAMI-LUKEN, INC. ("**Miami-Luken**") is an Ohio corporation with its principal place of business located in Springboro, Ohio. During all relevant times, Miami-Luken has distributed substantial amounts of prescription opioids to providers and retailers in Missouri.

A19. Defendant COSTCO WHOLESALE CORPORATION ("**Costco**") is a Washington corporation with its principal place of business in Issaqua, Washington. During all relevant times, Costco has sold and continues to sell, in Missouri and nationwide, prescription opioids including the Opioid Drugs at issue in this lawsuit.

A20. LINDEN CARE, LLC ("**Linden Care**") is a limited liability company. Linden Care's principal place of business and corporate headquarters is located in Woodbury, New York. At all relevant times, Linden Care served as a concierge pharmacy service specializing in filling, dispensing, and shipping pain medications, including the Opioid Drugs at issue in this lawsuit, throughout the United States, including Missouri, using commercial shipping services. During the relevant time period, Linden Care was reportedly the leading pharmacy dispenser of fentanyl spray. It dispensed and shipped fentanyl spray and other Opioid Drugs to patients throughout the United States, and in Missouri, by Federal Express. At all times material hereto, Linden Care solicited and received profits from Missouri prescriptions for fentanyl spray and Opioid Drugs.

A21. Defendant The Kroger Co. ("**Kroger**) is an Ohio corporation with headquarters in Cincinnati, OH. Kroger operates 2,268 pharmacies in the United States. At all times relevant to this Complaint, Kroger distributed prescription opioids throughout the United States, including in Missouri.

A22. Defendants H. D. Smith, LLC d/b/a HD Smith f/k/a H. D. Smith Wholesale Drug

Co., H. D. Smith Holdings, LLC, H. D. Smith Holding Company ("**H. D. Smith**") is a Delaware corporation with its principal place of business in Springfield, Illinois. H. D. Smith is a privately held independent pharmaceuticals distributor of wholesale brand, generic, and specialty pharmaceuticals. At all times relevant to this Complaint, H. D. Smith distributed prescription opioids throughout the United States, including Missouri.

A23. Defendant Anda, Inc. ("**Anda**"), is a Florida corporation with its principal office located in Olive Branch, Mississippi. Through its various DEA registrant subsidiaries and affiliated entities, Anda is the fourth largest distributor of generic pharmaceuticals in the United States, which includes Missouri State. In October 2016, Defendant Teva USA acquired Anda for $500 million in cash. At all relevant times, Anda distributed prescription opioids throughout the United States, including in Missouri.

**C. Purdue-Related Additional Defendants**

A24. Defendant Richard S. Sackler is a natural person residing in Travis County, Texas. He is a son of Raymond Sackler and, beginning in the 1990's, served as a member of the Board of Directors of Purdue and Purdue-related entities.

A25. Defendant Jonathan D. Sackler is a natural person residing in Fairfield County, Connecticut and, upon information and belief, New York State. He is a son of Raymond Sackler and has been a member of the Board of Directors of Purdue and Purdue-related entities since the 1990s.

A26. Defendant Mortimer D.A. Sackler is a natural person residing in New York County, New York. He is the son of Mortimer Sackler and has been a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

A27. Defendant Kathe A. Sackler is a natural person residing in Fairfield County, Connecticut, and, upon information and belief, New York State. She is the daughter of Mortimer

Sackler and has served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

A28. Defendant Ilene Sackler Lefcourt is a natural person residing in New York County, New York. She is the daughter of Mortimer Sackler and has served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

A29. Defendant Beverly Sackler is a natural person residing in Fairfield County, Connecticut. She is the widow of Raymond Sackler and has served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

A30. Defendant Theresa Sackler is a natural person residing in New York County, New York. She is the widow of Mortimer Sackler and has served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

A31. Defendant David A. Sackler is a natural person residing in New York County, New York. He is the son of Richard Sackler (and thus grandson of Raymond Sackler) and has served as a member of the board of directors of Purdue and Purdue related entities since 2012.

A32. Defendant Rhodes Technologies ("Rhodes Tech") is a Delaware general partnership formed on April 12, 2005 with its principal place of business in Coventry, R.I. At relevant times, Rhodes Tech or its predecessor has manufactured and supplied Purdue with oxycodone, the active pharmaceutical ingredient in OxyContin, for use in the manufacture of pharmaceutical preparations.

A33. Defendant Rhodes Technologies Inc. ("Rhodes Tech Inc.") is a Delaware corporation formed January 28, 1999 with its principal place of business in Coventry, R.I. Rhodes Tech Inc. is a general partner of Rhodes Tech. At relevant times, Rhodes Tech Inc. has manufactured and supplied Purdue with oxycodone, the active pharmaceutical ingredient in OxyContin, for use in the manufacture of pharmaceutical preparations or has managed Rhodes Tech or its predecessor in doing so.

A34. Defendant Rhodes Pharmaceuticals L.P. ("Rhodes Pharma") is a Delaware limited partnership formed November 9, 2007 with its principal place of business in Coventry, R.I. At all relevant times, Rhodes Pharma has marketed a generic form of OxyContin manufactured by Purdue Pharmaceuticals L.P. ("PPNC"), a Delaware limited partnership that is also a subsidiary of Defendant PPLP; PPNC owns and operates a pharmaceutical manufacturing facility in Wilson, North Carolina.

A35. Defendant Rhodes Pharmaceuticals Inc. ("Rhodes Pharma Inc.") is a New York corporation formed on November 9, 2007. Rhodes Pharma Inc. is a general partner of Rhodes Pharma. At all relevant times, Rhodes Pharma Inc. has marketed a generic form of OxyContin being manufactured by PPNC.

A36. Defendant Trust for the Benefit of Members of the Raymond Sackler Family (the "Raymond Sackler Trust") is a trust of which Defendants Beverly Sackler, Richard S. Sackler, and/or Jonathan D. Sackler are trustees.

A37. The Raymond Sackler Trust is a direct or indirect beneficial owner of 50% of Purdue as well as the recipient of 50% of the profits of Rhodes Pharma Inc.

A38. Defendant The P.F. Laboratories, Inc. ("PF Labs") is a New Jersey corporation with its principal place of business located in Totowa, New Jersey. It was, at relevant times, engaged in the business of manufacturing OxyContin for Purdue. At all relevant times, PF Labs has been beneficially owned, managed, and controlled by Sackler Family Defendants.

A39. The Raymond Sackler Trust is a direct or indirect beneficial owner of 50% of Purdue as well as the recipient of 50% of the profits of PF Labs.

A40. Each of the foregoing Additional Purdue Defendants, in addition to the Purdue Defendants included in the existing complaint, are referred to collectively as the Purdue Defendants and are included collectively in the term "Purdue," and collectively in the allegations, claims and

causes of action against "Purdue" and "Pharmaceutical Defendants" as addressed in the existing complaint.

## ALLEGATIONS PERTAINING TO ADDITIONAL DEFENDANTS

### A. Pharmaceutical Defendants

#### *Depomed*

A41. Depomed sales representatives misrepresented the safety and efficacy of its opioid drugs to physicians. Depomed has, since at least October 2011, engaged in unsafe and/or unapproved marketing of Lazanda and (with the acquisition from Janssen in January 2015) of Nucynta and Nucynta ER.

A42. Depomed sales representatives promoted Lazanda for unsafe and unapproved uses.

A43. Lazanda is only indicated "for the management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain." Despite the drug's explicit limitation, Depomed actively promoted Lazanda to physicians who do not treat cancer patients. Not only did Depomed instruct sales representatives to promote Lazanda to non-cancer treating physicians, the Company also discouraged sales representatives from marketing the drug to physicians treating cancer patients, even if the sales representatives were successful in gaining these doctors' business.

A44. When it launched Lazanda in 2011, the Company's management, from the start, disregarded the FDA's limitations concerning Lazanda's usage, instructing its sales representatives to target pain management physicians, particularly those who historically wrote large numbers of ROOs and Lazanda-like drugs.

A45. Sales representatives were pressured to target pain management physicians. Area managers at Depomed regularly supplied sales representatives with lists of target physicians

containing few, if any, physicians treating cancer patients. Of the typical call list containing approximately 100 physicians, under five generally treated cancer patients.

A46. Depomed also strongly discouraged sales representatives from targeting physicians treating cancer patients. Sales representatives had to "make a case" for using any portion of their allotted marketing money to call on cancer treating physicians. And employees who did call on cancer treating physicians were disciplined.

A47. One Depomed sales representative, who worked in the Los Angeles area, was chastised by management for targeting, almost exclusively, physicians treating cancer patients despite the fact that he had been very successful in generating business from these physicians. This representative was reprimanded for targeting physicians who could prescribe Lazanda for its indicated use, and was told to stop targeting these physicians, and to think about how well he could be doing if he was targeting potentially higher writer. Depomed explicitly told sales representatives to market only to non-cancer treating physicians by their managers, most notably Todd Wittenbach, the company's then head of sales for the United States.

A48. Depomed sales representatives were also trained to deal with (rightful) pushback from physicians. For example, when confronted with the common statement from a physician that "it's extremely rare that we see cancer patients," Depomed trained sales representatives to divert the conversation to the physician's use of other, similar medications. For example, sales representatives were trained to respond by saying "well tell me about your patients taking Actiq," and then extol the relative benefits of switching those patients to Lazanda.

A49. Due to the worsening headwinds within the opioid market, Depomed ultimately sold Lazanda to Slán Medicinal Holdings on November 7, 2017.

A50. Depomed sales representatives promoted Nucynta and Nucynta ER for unsafe and unapproved uses.

A51. On April 2, 2015, Depomed acquired from Janssen and its affiliates the U.S. rights to the Nucynta franchise of pharmaceutical products for $1.05 billion in cash. The Nucynta franchise is an opioid that includes Nucynta ER (tapentadol) extended release tablets indicated for the management of pain, including neuropathic pain associated with diabetic peripheral neuropathy (DPN), severe enough to require daily, around-the-clock, long-term opioid treatment, Nucynta IR (tapentadol), an immediate release version of tapentadol, for management of moderate to severe acute pain in adults, and Nucynta (tapentadol) oral solution, an approved oral form of tapentadol that has not been commercialized.

A52. Nucynta's annual sales increased in the U.S. from $189.9 million in 2015 to approximately $281.3 million in 2016, quickly becoming Depomed's best-selling product. This marked a 48% year-over-year growth in sales of Nucynta in just one year.

A53. The marketing strategy causing the astronomical growth in sales, however, was fueled by Depomed's illegal practices in connection with its marketing of Nucynta for unsafe and unapproved uses. In particular, Depomed promoted the use of opioids for all manner of pain management while downplaying the drug's addictive nature, often promoting the drug as a safer alternative to opioids, despite this not being on the FDA label.

A54. Further, Depomed promoted an increase in dosage while focusing on family physicians and internal medicine doctors who were less knowledgeable about the dangers of opioids. In February 2017, Depomed's former CEO increased its sales force for the specific purpose of targeting primary care physicians.

A55. The FDA-approved labels for both Nucynta IR and Nucynta ER describe the tapentadol molecule as "a substance with a high potential for abuse similar to other opioids including fentanyl, hydrocodone, hydromorphone, methadone, morphine, oxycodone, and oxymorphone." Nowhere on the FDA-approved label does it say or mention that Nucynta is safer,

more tolerable, less abusive, or less addictive than other opioids. Despite this, Nucynta has a long history of its manufacturer (formerly Janssen) claiming these benefits in its sales pitches and marketing.

A56. Nonetheless, Depomed directed its sales representatives to market Nucynta for unsafe and unapproved uses as a safer, less abusive, less addictive opioid that did not create the same euphoric feeling as other opioids, even though this was not on the FDA-approved label.

A57. Depomed management knew that the FDA-approved label for Nucynta contained no information about it being safer, more tolerable, less addictive, or less abusive than alternative opioids, and knew they could not market Nucynta this way. 245. On June 23, 2015 investor call, August Moretti, Depomed's Senior Vice President and Chief Financial Officer, stated that "[a]lthough not in the label, there's a very low abuse profile and side effect rate."

A58. Additionally, in a March 14, 2015 presentation at the ROTH Conference, then Depomed CEO Schoeneck stated: "The addiction profile is thought to be better. I can't make a claim around that because we don't actually have that in the label." In February 2017, Schoeneck also told investors that Depomed was "initiating label enhancement studies, aimed at further differentiating Nucynta by highlighting its respiratory depression and abuse potential profile. These labeling studies will focus on the properties of the tapentadol molecule, and its uniqueness in the pain marketplace." The purpose of this was to "be able to get it hopefully into the label."

A59. Depomed's marketing push was "Think Differently." Sales representatives were told that Nucynta is a "safer opioid." They were told to tell physicians about Nucynta and its value to patients in terms of, among other things, improved safety relative to other opioids on the market.

A60. Depomed actively targeted primary care physicians with marketing presentations that described Nucynta as a safer, less addictive, less abusive opioid that did not contain the same euphoric feeling as other opioids. Depomed did not have FDA-approval to market Nucynta in this

manner, and also did not have any independent scientific evidence to support these claims.

A61. Depomed represented that Nucynta was uniquely positioned to combat the negative public sentiment against Opioids. Former President and CEO James Schoeneck described to investors that Nucynta had "different properties than the other opioids, particularly when it comes to the kind of activity that the CDC and others are most concerned about" and that "there'll be relatively little impact on [Depomed] compared to where some other companies may fall in at."

A62. Depomed knew that it could not promote Nucynta as a safer, less addictive, less abusive opioid that did not have the same euphoric feeling on patients because these properties were not on its FDA-approved label. Despite this knowledge, Depomed trained its sales representatives to use these marketing tactics to sell Nucynta, using the same sales team as Janssen had to promote Nucynta, knowing that Janssen was being sued for, among other things, improperly marketing Nucynta.

A63. Due to the worsening headwinds within the Opioid market, Depomed ultimately entered into a commercialization agreement with Collegium Pharmaceutical, Inc., for the NUCYNTA brand on December 4, 2017.

***Mallinckrodt***

A64. In Missouri and nationwide, Mallinckrodt is engaged in the manufacture, promotion, distribution, and sale of opioids such as Roxicodone, Exalgo, Xartemis XR, as well as oxycodone and other generic opioids.

A65. Mallinckrodt engaged in widespread conduct aimed at vastly increasing profits resulting from the sale of opioid drugs by increasing prescriber demand, increasing patient demand, facilitating insurance coverage, and nurturing the thriving black market for opioid drugs by concealing evidence of drug diversion.

A66. Upon information and belief, Mallinckrodt promoted the use of opioids for

chronic pain through "detailers," who were sales representatives who visited individual physicians and their staff in their offices and small group speaker programs. Mallinckrodt sales representatives misrepresented the safety and efficacy of its opioid drugs to physicians.

A67. Mallinckrodt provided substantial funding to purportedly neutral organizations which disseminated false messaging about opioids. For example, until at least February 2009, Mallinckrodt provided an educational grant to Pain- Topics.org, a now-defunct website that touted itself as "a noncommercial resource for HCPs, providing open access to clinical news, information, research, and education for a better understanding of evidence-based pain-management practices."

A68. In November 2016, Mallinckrodt paid Dr. Scott Gottlieb ("Gottlieb"), the new commissioner of the FDA, $22,500 for a speech in London, shortly after the U.S. presidential election. Gottlieb has also received money from the HDA, an industry-funded organization that pushes the agenda of large pharmaceutical wholesalers, and he has often criticized efforts aimed at regulating the pharmaceutical opioid market.

A69. Mallinckrodt, combined with five other opioids manufacturers, made payments exceeding $140,000 to ten members of the ACPA Advisory Board.

A70. Mallinckrodt's aggressive and misleading marketing to prescribers and consumers, development of fake scientific substantiation and literature, and failure to prevent, monitor, identify, and report drug diversion, all contributed to a vast increase in opioid overuse and addiction.

A71. Mallinckrodt, plc, Mallinckrodt, LLC and SpecGx, LLC and their subsidiaries are "Pharmaceutical Defendants" as used in the existing complaint. Plaintiffs adopt all allegations and causes of action alleged against the Pharmaceutical Defendants in the existing complaint.

***Insys***

A72. Since 2012, Insys has been manufacturing and selling Subsys, a spray form of

fentanyl, in Missouri and across the United States. Subsys is a highly addictive mouth spray approved for use in cancer patients who are tolerant of other opioids. In 2016, Subsys had a 42% market share of transmucosal immediate-release fentanyl, which generated $300 million in annual U.S. sales for the company. Only 1% of Subsys sales have been generated by oncologists.

A73. Insys sales representatives misrepresented the safety and efficacy of Subsys to physicians.

A74. Fentanyl is a powerful drug that can cause serious side effects, including death. For this reason, the TIRF REMS Access Program advises all "stakeholders" to "[p]romptly report suspected adverse events associated with the use of a TIRF medicine including misuse, abuse, and overdose directly to the TIRF REMS Access program . . . [and/or] to the FDA MedWatch Reporting System."25 Between August 13, 2011, and August 12, 2014, there were a total of 13,196 cases and 48,323 incidents, with 2,356 deaths reported through the FDA Adverse Event Reporting System ("FAERS") in which one of the drugs reported contained fentanyl as an active ingredient - not necessarily Subsys.

A75. In order to increase the number of Subsys prescriptions for which it received reimbursement and to obtain reimbursement for unsafe and unapproved prescriptions of Subsys, Insys directed and engaged in a conspiracy with prescribers to increase the number of Subsys prescriptions written and to provide material misrepresentations during the prior-authorization process regarding whether patients had breakthrough cancer pain and/or were opioid tolerant in order to obtain reimbursements for those prescriptions.

A76. The top ten prescribers of Subsys were paid handsomely for their participation in the speaker program – collectively receiving more than $870,000 in speaker fees in 2013 and 2014 alone.

A77. Two physicians in Mobile, Alabama, operated a pain management clinic and

between 2012, when Subsys became available, and 2013, they became among the top prescribers in the United States. However, of the thousands of patients they treated, very few had cancer, which indicated they had a prominent role in the scheme.

A78. In October 2013, the clinic prescribed Subsys more than any other medicine. During that month, the physicians — Dr. John Couch and Dr. Xiulu Ruan — together wrote 110 prescriptions. Furthermore, of those prescriptions, 33 were for patients who had previously never been prescribed the medicine, and nearly all were written off-label to patients who did not have cancer.

A79. Insys compensated these two physicians for the prescribing practices by paying them nearly $210,000, mostly in speaking and consulting fees, in 2013 and 2014, according to the Open Payments database, which tracks payments made by drug makers to physicians.

A80. But Insys's efforts to funnel illegal kickbacks to Subsys prescribers were not limited to speaker fees. The company also offered valuable administrative services to prescribers' offices at no charge in exchange for Subsys prescriptions. To that end, Insys created a "reimbursement unit" that was deployed to prescriber practices to handle the prior-authorization process.

A81. In addition, Insys was engaged in a scheme to promote Subsys for unapproved and unsafe uses in order to increase the number of Subsys prescriptions written.

A82. Insys sales representatives aggressively targeted high-volume opioid drug prescribers without regard to the suitability of the patient population for the approved use of Subsys.

A83. Insys misrepresented to prescribers and patients the approved use and dosage parameters for Subsys.

A84. Insys sales representatives encouraged prescribers to disregard FDA approved

indications and FDA mandated dosing, instead marketing Subsys for breakthrough pain generically.

A85. Then, once the prescriptions were written, using its "reimbursement unit," Insys conspired with prescribers to fraudulently obtain prior authorizations for non-covered prescriptions.

A86. Insys's fraudulent scheme has received much scrutiny by the federal and state governments.

A87. Among other things, the executives were charged with conspiracy to commit racketeering, conspiracy to commit wire and mail fraud, and RICO conspiracy.

A88. Insys made payments to clinicians to induce them to write unsafe and unapproved prescriptions of Subsys. Some of these payments were made pursuant to a sham "speaker program" that Insys created to shield the illegality of its financial arrangements with the conspiring prescribers.

A89. Through this "speaker program," Insys paid prescribers to give presentations on Subsys, purportedly to increase brand awareness via peer-to-peer educational lunches and dinners.

A90. Insys's speaker programs were poorly disguised kickbacks. Insys hired selected doctors to give talks in promotional settings about Subsys. Insys sought "coachable" doctors willing to laud Subsys' effectiveness to other doctors. In addition, speakers were offered honoraria, ranging from $800 to $1200 per program, for their speaking engagements. Insys's payments to these doctors greatly exceeded the fair market value and reasonable compensation ordinarily given to a speaker in a typical arms-length transaction, particularly as presentations were often short and the audiences small.

A91. Most of the presentations, however, would make only a cursory mention of Subsys, and in some there was no mention of Subsys at all. And many were attended only by the prescriber and sales representatives or others individuals who had no authority to prescribe the drug – thereby

eliminating any question of the program's utility beyond masking Insys's real intent to pay prescribers for prescriptions.

A92. Some speakers were chosen as a reward for prescribing drugs. In fact, as soon as Alec Burlakoff took over as Southeast Regional Sales Manager in June 2012, Burlakoff told the sales representatives under his direction that "speaker programs would be the key to their success" and that "the purpose of the speaker programs was to get money in the doctor's pocket." On September 12, 2012, Burlakoff was promoted to Vice President of Sales. As Vice President of Sales, Burlakoff continued to push the message that speakers should be writing one prescription a day in order to remain a Subsys speaker, particularly in light of the Company's view that speakers should have clinical experience with Subsys or be removed from the speaker program.

A93. On September 19, 2012, Insys held a national meeting for all of its sales representatives in Phoenix, Arizona, where Insys's headquarters are located. The same day, Joe Rowan, who took over as the Southeast Regional Manager for Insys, sent an e-mail to the Southeast Region sales representatives, stating that they each needed to schedule six speaker programs over the next two weeks. When sales representatives told Rowan that they may not be able to meet this goal because some doctors were not writing more prescriptions after becoming speakers. Rowan responded that if he is "not putting pen to paper, we need to get rid of him."

A94. Insys's kickback strategy contributed to the Opioid Crisis because doctors, blinded by Insys's remunerations, prescribed Subsys: (a) when they would not have otherwise if not for the kickbacks; or (b) when medically unnecessary and ineffective.

A95. The prescribers chosen for these lucrative speaking opportunities are further evidence of the true motivation behind the program. Insys targeted prescribers running pain clinics – particularly those who were high-volume opioid prescribers – for these "speaker programs," as opposed to oncologists treating patients that met the conditions set forth in the label.

A96. Insys formed a sham speakers' bureau, the primary purpose of which was to facilitate peer-to-peer educational lunches and dinners to increase brand awareness. The Indictment against Insys alleges that executives would meet with, make telephone calls, and send text messages to Insys sales representatives informing them that the key to sales was using the speakers' bureau to pay practitioners to prescribe Subsys. One vice president for sales texted one of his sales representatives regarding potential physician speakers: "[t]hey do not need to be good speakers, they need to write a lot of [Subsys prescriptions.]" As such, Insys would actively recruit physicians known to have questionable prescribing habits.92

A97. The Indictment further alleges that the speakers' bureaus were often simply social gatherings at expensive restaurants that involved neither education or presentations and often included repeat attendees, including physicians not licensed to prescribe Subsys. Many of the meetings had no attendees, in which case sales representatives were instructed to falsify a list of names and signatures on the sign-in sheets.

A98. Speakers were not selected to share their expertise, but were rather paid to follow the slide decks provided to them by the Pharmaceutical Defendants. This is important because the FDA regards promotional talks as part of product labeling, and requires their submission for review. Speakers thus give the appearance of providing independent, unbiased presentations on opioids, when in fact they are presenting a script prepared by Defendants' marketing departments. Endo's speaker rules, for example, provide that "all slides must be presented in their entirety and without alterations . . . and in sequence."

A99. Insys, working together with Linden Care, conducted a nationwide illegal scheme to market and sell Subsys. Through kickbacks and bribes to doctors and other health care professionals, and other fraudulent means, Insys and Linden Care collectively made hundreds of millions of dollars while exposing patients to the drug's extraordinary risks, including addiction and

abuse, and ultimately in utero drug exposure.

A100. Between 2012 and 2017, Insys made payments to Front Groups, including USPF ($2,500,000), NPF ($562,500), AAPM ($57,750), APS ($22,965), and AIPM ($3,050). During those years, Insys's payments to Front Groups exceeded $3.1 million.

A101. Between 2012 and 2017, Insys (combined with Purdue, Janssen, Depomed, and Mylan) also made payments to individuals affiliated with Front Groups, including: NPF ($839,848), AAPM ($330,636), ASPE ($280,765), APS ($95,474), ACPA ($31,265), and AIPM ($30,223).

A102. Insys representatives sat on AAPM's corporate council, whose membership cost Actavis $25,000 per year. Insys used its AAPM corporate council membership to make false and misleading presentations to prescribing physicians at AAPM's annual meetings.

A103. Insys also made presentations (and/or exhibits) at APS annual scientific meetings, including in 2013 and 2014. These presentations dealt with the use of Insys's Opioid Drugs for the long-term treatment of chronic pain.

A104. Insys utilized advertisements, websites, Front Groups, and bogus "initiatives" to increase patient demand for Opioid Drugs by falsely representing the safety and efficacy of long-term opioid therapy for the treatment of chronic pain. These patient-oriented marketing measures are in addition to those (alleged above) undertaken by the Front Groups, with whom Insys was intertwined.

A105. Insys also provided financial assistance to would-be users of their Opioid Drugs. For example, Insys contributed $2.5 million to the USPF's "Gain Against Pain" patient assistance program, which provided financial assistance for patients' medical copays.

***Par Pharmaceutical***

A106. Par Pharmaceutical is an affiliate of Defendants Endo Health Solutions Inc. ("EHS") and Endo Pharmaceuticals, Inc. ("EPI). EHS, EPI, and Par Pharmaceutical, and their DEA

registrant subsidiaries and affiliates (collectively, "Endo"), manufacture opioids sold throughout the United States. Plaintiffs adopt all allegations and causes of action alleged against Endo and the Pharmaceutical Defendants alleged in the existing complaint against Par Pharmaceutical.

*Noramco*

A107. Defendant Noramco, Inc. ("Noramco") is a Delaware company headquartered in Wilmington, Delaware and was a wholly owned subsidiary of J&J and its manufacturer of active pharmaceutical ingredients until July 2016 when J&J sold its interests to SK Capital. All allegations pertaining to Janssen also apply to Noramco. Plaintiffs adopt all allegations and causes of action alleged against the Pharmaceutical Defendants alleged in the existing complaint against Noramco.

*Invidior*

A108. Invidior manufactures and distributes buprenorphine-based prescription drugs for treatment of opioid dependence. Buprenorphine is a Schedule III drug. The company offers medication under the brand name Suboxone and sublingual tablets under the brand name Subutex. Indivor, Inc. has manufactured and/or labeled Buprenorphine shipped to Missouri. Plaintiffs adopt all allegations and causes of action alleged against the Pharmaceutical Defendants alleged in the existing complaint against Invidior.

**B. Distributor Defendants**

*CVS*

A109. CVS, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. CVS also operates retail stores, including in Missouri, that sell prescription medicines, including opioids.

A110. At all times relevant to this Complaint, CVS distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in Missouri.

A111. CVS is one of the largest companies in the world, with annual revenue of more than $150 billion. According to news reports, it manages medications for nearly 90 million customers at 9,700 retail locations.

A112. CVS is a repeat offender and recidivist: the company has paid fines totaling over $40 million as the result of a series of investigations by the DEA and the United States Department of Justice ("DOJ"). It nonetheless treated these fines as the cost of doing business and has allowed its pharmacies to continue dispensing opioids in quantities significantly higher than any plausible medical need would require, and to continue violating its recordkeeping and dispensing obligations under the CSA.

A113. As recently as July 2017, CVS entered into a $5 million settlement with the U.S. Attorney's Office for the Eastern District of California regarding allegations that its pharmacies failed to keep and maintain accurate records of Schedule II, III, IV, and V controlled substances.

A114. This fine was preceded by numerous others throughout the country.

A115. In February 2016, CVS paid $8 million to settle allegations made by the DEA and the DOJ that from 2008-2012, CVS stores and pharmacists in Maryland violated their duties under the CSA and filling prescriptions with no legitimate medical purpose.

A116. In October 2016, CVS paid $600,000 to settle allegations by the DOJ that stores in Connecticut failed to maintain proper records in accordance with the CSA.

A117. In September 2016, CVS entered into a $795,000 settlement with the Massachusetts Attorney General wherein CVS agreed to require pharmacy staff to access the state's prescription monitoring program website and review a patient's prescription history before dispensing certain opioid drugs.

A118. In June 2016, CVS agreed to pay the DOJ $3.5 million to resolve allegations that 50 of its stores violated the CSA by filling forged prescriptions for controlled substances—mostly

addictive painkillers—more than 500 times between 2011 and 2014.

A119. In August 2015, CVS entered into a $450,000 settlement with the U.S. Attorney's Office for the District of Rhode Island to resolve allegations that several of its Rhode Island stores violated the CSA by filling invalid prescriptions and maintaining deficient records. The United States alleged that CVS retail pharmacies in Rhode Island filled a number of forged prescriptions with invalid DEA numbers, and filled multiple prescriptions written by psychiatric nurse practitioners for hydrocodone, despite the fact that these practitioners were not legally permitted to prescribe that drug. Additionally, the government alleged that CVS had recordkeeping deficiencies.

A120. In May 2015, CVS agreed to pay a $22 million penalty following a DEA investigation that found that employees at two pharmacies in Sanford, Florida, had dispensed prescription opioids, "based on prescriptions that had not been issued for legitimate medical purposes by a health care provider acting in the usual course of professional practice. CVS also acknowledged that its retail pharmacies had a responsibility to dispense only those prescriptions that were issued based on legitimate medical need."

A121. In September 2014, CVS agreed to pay $1.9 million in civil penalties to resolve allegations it filled prescriptions written by a doctor whose controlled-substance registration had expired.

A122. In August 2013, CVS was fined $350,000 by the Oklahoma Pharmacy Board for improperly selling prescription narcotics in at least five locations in the Oklahoma City metropolitan area.

A123. Dating back to 2006, CVS retail pharmacies in Oklahoma and elsewhere intentionally violated the CSA by filling prescriptions signed by prescribers with invalid DEA registration numbers.

A124. CVS has had knowledge and/or notice of the opioid problem since at least 2002.

A125. At any time since CVS had knowledge and/or notice of the opioid problem it could have unilaterally taken steps to curtail and prevent expansion of the problem, but it failed to do so.

A126. In their capacity as wholesale distributors, CVS and its subsidiaries are "Distributor Defendants" as used in the existing complaint. Plaintiffs adopt all allegations and causes of action alleged against the Distributor Defendants in the existing complaint against CVS.

***Rite Aid***

A127. Rite Aid, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. Rite-Aid also operates retail stores, including in Missouri, that sell prescription medicines, including opioids.

A128. At all times relevant to this Complaint, Rite Aid, through its various DEA registered subsidiaries and affiliated entities, distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in Missouri.

A129. With approximately 4,600 stores in 31 states and the District of Columbia, Rite Aid is the third-largest drug store chain in the United States, with annual revenue of more than $21 billion.

A130. In 2009, as a result of a multi-jurisdictional investigation by the DOJ, Rite Aid and nine of its subsidiaries in eight states were fined $5 million in civil penalties for its violations of the CSA.

A131. The investigation revealed that from 2004 onwards, Rite Aid pharmacies across the country had a pattern of non-compliance with the requirements of the CSA and federal regulations that lead to the diversion of prescription opioids in and around the communities of the Rite Aid pharmacies investigated. Rite Aid also failed to notify the DEA of losses of controlled substances in violation of 21 USC 842(a)(5) and 21 C.F.R1301.76(b).

A132. In their capacity as wholesale distributors, Rite-Aid and its subsidiaries are

"Distributor Defendants" as used in the existing complaint. Plaintiffs adopt all allegations and causes of action alleged against the Distributor Defendants in the existing complaint against Rite Aid.

*Walgreens*

A133. Walgreens, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. At all times relevant to this Complaint, Walgreens distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in Missouri.

A134. Walgreens is the second-largest pharmacy store chain in the United States behind CVS, with annual revenue of more than $118 billion. According to its website, Walgreens operates more than 8,100 retail locations and filled 990 million prescriptions on a 30-day adjusted basis in fiscal 2017.

A135. Walgreens also has been penalized for serious and flagrant violations of the CSA. Indeed, Walgreens agreed to the largest settlement in DEA history—$80 million—to resolve allegations that it committed an unprecedented number of recordkeeping and dispensing violations of the CSA, including negligently allowing controlled substances such as oxycodone and other prescription opioids to be diverted for abuse and illegal black market sales.

A136. The settlement resolved investigations into and allegations of CSA violations in Florida, New York, Michigan, and Colorado that resulted in the diversion of millions of opioids into illicit channels.

A137. Walgreens' Florida operations at issue in this settlement highlight its egregious conduct regarding diversion of prescription opioids. Walgreens' Florida pharmacies each allegedly ordered more than one million dosage units of oxycodone in 2011—more than ten times the average amount.

A138. They increased their orders over time, in some cases as much as 600% in the space of just two years, including, for example, supplying a town of 3,000 with 285,800 orders of oxycodone in a one-month period. Yet Walgreens corporate officers turned a blind eye to these abuses. In fact, corporate attorneys at Walgreens suggested, in reviewing the legitimacy of prescriptions coming from pain clinics, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance," underscoring Walgreens' attitude that profit outweighed compliance with the CSA or the health of communities.

A139. Defendant Walgreens' settlement with the DEA stemmed from the DEA's investigation into Walgreens' distribution center in Jupiter, Florida, which was responsible for significant opioid diversion in Florida. According to the Order to Show Cause, Defendant Walgreens' corporate headquarters pushed to increase the number of oxycodone sales to Walgreens' Florida pharmacies, and provided bonuses for pharmacy employees based on number of prescriptions filled at the pharmacy in an effort to increase oxycodone sales. In July 2010, Defendant Walgreens ranked all of its Florida stores by number of oxycodone prescriptions dispensed in June of that year, and found that the highest-ranking store in oxycodone sales sold almost 18 oxycodone prescriptions per day. All of these prescriptions were filled by the Jupiter Center.

A140. Walgreens has also settled with a number of state attorneys general, including West Virginia ($575,000) and Massachusetts ($200,000).

A141. The Massachusetts Attorney General's Medicaid Fraud Division found that, from 2010 through most of 2015, multiple Walgreens stores across the state failed to monitor the opioid use of some Medicaid patients who were considered high-risk.

A142. In January 2017, an investigation by the Massachusetts Attorney General found that some Walgreens pharmacies failed to monitor patients' drug use patterns and didn't use sound

professional judgment when dispensing opioids and other controlled substances—despite the context of soaring overdose deaths in Massachusetts. Walgreens agreed to pay $200,000 and follow certain procedures for dispensing opioids.

A143. In their capacity as wholesale distributors, Walgreens and its subsidiaries are "Distributor Defendants" as used in the existing complaint. Plaintiffs adopt all allegations and causes of action alleged against the Distributor Defendants in the existing complaint against Walgreens.

***Wal-Mart***

A144. Walmart, through its various DEA registered affiliated entities, conducts business as a licensed wholesale distributor. At all times relevant to this Complaint, Wal-Mart distributed prescription opioids throughout the United States.

A145. In its capacity as a wholesale distributor, Wal-Mart is a "Distributor Defendant" as used in the existing complaint. Plaintiffs adopt all allegations and causes of action alleged against the Distributor Defendants in the existing complaint against Wal-Mart.

***Miami-Luken***

A146. During all relevant times, upon information and belief, Miami-Luken has distributed substantial amounts of prescription opioids to providers and retailers in Missouri.

A147. On November 23, 2015, the DEA issued an Order to Show Cause to begin the process of revoking Miami-Luken's Certificate of DEA Registration.

A148. In its revocation proceeding, the DEA has alleged that Miami-Luken failed to maintain effective controls against diversion of controlled substances and that the company failed to operate a system to disclose suspicious orders of controlled substances when it shipped controlled substances, particularly oxycodone and hydrocodone, to customers in southern Ohio, eastern Kentucky, and southern West Virginia.

A149. In early 2016, Miami-Luken agreed to pay the state of West Virginia $2.5 million to resolve allegations that the company knowingly shipped opioids to West Virginia pharmacies without exercising sufficient monitoring or control.

A150. In its capacity as a wholesale distributor, Miami-Luken is a "Distributor Defendant" as used in the existing complaint. Plaintiffs adopt all allegations and causes of action alleged against the Distributor Defendants in the existing complaint against Miami-Luken.

***CostCo***

A151. Costco failed to track and report suspicious sales of its opioid drugs.

A152. Costco is a "registrant" under the federal CSA, 21 C.F.R. §1300.02(b), which defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires pharmacies dispensing Schedule II controlled substances to register with the DEA.

A153. Contrary to its duties as a registrant, in 2017, Costco Wholesale was fined $11.75 million as a result of a multijurisdictional investigation by the DOJ relating to CSA violations.

A154. According to the investigation, Costco pharmacies filled prescriptions that were incomplete, lacked valid DEA registration numbers or were for substances beyond various doctors' scope of practice. Additionally, the settlement resolves allegations that Costco failed to keep and maintain accurate records for controlled substances at its pharmacies.

A155. Between January 1, 2012 and December 31, 2015, certain Costco pharmacies dispensed controlled substances inconsistent with their compliance obligations under the CSA and its implementing regulations. The violations include: filling prescriptions from practitioners who did not have a valid DEA number, incorrectly recording the practitioner's DEA number, filling prescriptions outside the scope of a practitioner's DEA registration, filling Prescriptions that did not contain all the required information, failing to maintain accurate dispensing records, and

failing to maintain records for their central fill locations in Sacramento, California and Everett, Washington.

A156. According to U.S. Attorney Eileen M. Decker: "These are not just administrative or paperwork violations – Costco's failure to have proper controls in place in its pharmacies played a role in prescription drugs reaching the black market…."

A157. Furthermore, Costco could and should have taken action that: (a) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reduced the dispensing of stronger and extended release opioids; (c) enhanced pharmacist counseling for new opioid patients; (d) limited the daily dosage of opioids dispensed based on the strength of the opioid; and (e) required the use of immediate- release formulations of opioids before extended-release opioids are dispensed.

A158. Having knowledge and/or notice of the damages that Costco's conduct had caused to Plaintiff and the Class, Costco failed to take other steps to help curb the damages already incurred by Plaintiff due to Defendants, including Costco, could have: (a) donated medication disposal units to community police departments across the country to ensure unused opioid painkillers are disposed of properly rather than taken by individuals to whom the prescription was not written or otherwise diverted or abused; (b) implemented a program that consists of providing counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; (c) run public education campaigns in which Costco ran public education programs; (d) limited to 7 days the supply of opioids dispensed for certain acute prescriptions; (e) reduced the dispensing of stronger and extended release opioids; (f) enhanced pharmacist counseling for new opioid patients; (g) limited the daily dosage of opioids dispensed based on the strength of the opioid; and h) required the use of immediate-release formulations of

opioids before extended-release opioids are dispensed.

A159. Costco could have and should have implemented these measures at any point in the last 15 years.

A160. And the failure to take such steps that Costco should have taken was negligent and did result in significant damages to Plaintiff and the Class.

A161. In its capacity as a wholesale distributor, CostCo is a "Distributor Defendant" as used in the existing complaint. Plaintiffs adopt all allegations and causes of action alleged against the Distributor Defendants in the existing complaint against CostCo.

*Linden Care*

A162. At all relevant times, Linden Care served as a concierge pharmacy service specializing in filling, dispensing, and shipping pain medications, including the Opioid Drugs at issue in this lawsuit, throughout the United States, including Missouri, using commercial shipping services. During the relevant time period, Linden Care was reportedly the leading pharmacy dispenser of fentanyl spray. Linden Care does not have physical retail pharmacies in Missouri. Instead, it dispensed and shipped fentanyl spray and other Opioid Drugs to patients throughout the United States, and in Missouri, by Federal Express.

A163. Linden care failed to track and report suspicious sales of Opioid Drugs.

A164. Linden Care is a "registrant" under the federal CSA, 21 C.F.R. §1300.02(b), which defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823, in turn, requires pharmacies dispensing Schedule II controlled substances to register with the DEA.

A165. Linden Care was formed in New York in 2006 to provide concierge pharmacy services. It has specialized in filling, dispensing, and shipping pain medications including Opioid Drugs throughout the country via mail/commercial shipping services, most of which related to

treatment of chronic disease and pain management.

A166. In essence, Linden Care was engaged in the practice of mail order pharmacology, by and through its agents and employees, who were obligated to use professional skill, knowledge and care from their education, training and standards.

A167. At all relevant times, Linden Care ignored and subverted its legal duties in dispensing fentanyl spray and other Opioid Drugs and was willfully blind and reckless in the manner in which it operated.

A168. The Insys scheme to profit by marketing and promoting Subsys included one other player: a pharmacy willing to dispense such large amounts of the medication and look the other way. Linden Care, a New York pharmacy specializing in supplying opioids and pain medicine, was just the pharmacy. It turned a blind eye to what Insys was doing and shipped Subsys to patients throughout the United States and in Missouri. Linden Care filled approximately 50% of the sales of Subsys in the United States.

A169. In its capacity as a wholesale distributor, Linden Care is a "Distributor Defendant" as used in the existing complaint. Plaintiffs adopt all allegations and causes of action alleged against the Distributor Defendants in the existing complaint against Linden Care.

***Kroger***

A170. Kroger operates 2,268 pharmacies in the United States which distributed prescription opioids throughout the United States, including in Nebraska and Douglas County specifically.

A171. At all relevant times, Kroger distributed, supplied, sold, and placed into the stream of commerce the prescription opioids, without fulfilling the fundamental duty of wholesale drug distributors to detect and warn of diversion of dangerous drugs for non-medical purposes. Kroger universally failed to comply with federal and/or state law. Kroger engaged in "wholesale distribution," as defined under state and federal law. Plaintiff alleges the unlawful conduct by Kroger

is a substantial cause for the Opioid Crisis and the injuries to the Class.

A172. In its capacity as a wholesale distributor, Kroger is a "Distributor Defendant" as used in the existing complaint. Plaintiffs adopt all allegations and causes of action alleged against the Distributor Defendants in the existing complaint against Kroger.

*H.D. Smith*

A173. Smith is a privately held independent pharmaceuticals distributor of wholesale brand, generic, and specialty pharmaceuticals. At all times relevant to this Complaint, H. D. Smith distributed prescription opioids throughout the United States.

A174. H. D. Smith has also routinely been found to have violated its duties to report suspicious orders and halt suspicious shipments of prescription opioids. According to a recent letter from the U.S. House of Representatives Committee on Energy and Commerce, data provided to the Committee showed that between 2007 and 2008, H. D. Smith provided two pharmacies in Williamson, WV, a town with a population of 3,191, combined total of nearly 5 million hydrocodone and oxycodone pills - approximately 1,565 hydrocodone and oxycodone pills for every man, woman, and child in Williamson, WV.188 According to press reports, H. D. Smith distributed approximately 13.7 million hydrocodone and 4.4 million oxycodone pills to West Virginia between 2007 and 2012.189 Press accounts further indicate that H. D. Smith did not submit any suspicious order reports to the state for at least a decade.190 Upon information and belief, H. D. Smith engaged in similar wrongful activities in Missouri.

A175. In its capacity as a wholesale distributor, H.D. Smith is a "Distributor Defendant" as used in the existing complaint. Plaintiffs adopt all allegations and causes of action alleged against the Distributor Defendants in the existing complaint against H.D. Smith.

*Anda*

A176. Through its various DEA registrant subsidiaries and affiliated entities, Anda is the

fourth largest distributor of generic pharmaceuticals in the United States. In October 2016, Defendant Teva Pharmaceuticals USA, Inc. ("Teva") acquired Anda for $500 million in cash. At all times relevant to this Complaint, Anda distributed prescription opioids throughout the United States, including in Missouri.

A177. In its capacity as a wholesale distributor, Anda is a "Distributor Defendant" as used in the existing complaint. Plaintiffs adopt all allegations and causes of action alleged against the Distributor Defendants in the existing complaint against Anda.

**C. The Purdue-Related Additional Defendants Participated in and Profited from Purdue's Wrongdoing**

**i. Structure of the Purdue Entities and the Roles of the Purdue-Related Defendants**

A178. Purdue is part of a greater, complicated web of entities through which the Sackler Families operate. PPI is the managing general partner of PPLP and of many of the various Purdue-related entities. Its status as managing general partner of the various entities ensures PPI's control of those entities. In turn, at all relevant times, all of the members of the board of PPI have been Sackler Family Defendants and Sackler-family retainers. The entities directly or indirectly related to Purdue that are not controlled by the Sackler Family Defendants through PPI are, nonetheless, controlled by the Sackler Family Defendants through different entities presently unknown to Plaintiffs. For instance, at all relevant times, the Sackler Family Defendants and the Sackler Families controlled PF Labs and Rhodes Pharma.

A179. Because the Sackler Family Defendants and/or the Sackler Families control of the board of PPI, all of the officers employed by PPI and PPLP reported to them. This ensured Sackler domination and control of PPI and PPLP, even when the officers of those entities were not themselves members of the Sackler Families or Sackler Family Defendants.

A180. The Sackler Family Defendants and/or Sackler Families are beneficial owners of, and

exercise complete domination and control over, all four Rhodes-identified Defendants and PF Labs.

A181. The Sackler Family Defendants and/or Sackler Families Sackler approved the decision to enter the generic market for OxyContin in or about 2008, and that it should do so through Rhodes Pharma, a Sackler-owned entity created for that purpose.

A182. The Sackler Family Defendants and/or Sackler Families caused Purdue and other associated companies that they beneficially owned and controlled to distribute to the Sackler Families hundreds of millions of dollars of profits earned by Purdue and its associated companies from the sale of opioids.

A183. Each of the Sackler Family Defendants named herein has served on the board of directors of, or as an officer of, Purdue and one or more Purdue-related business entities, like PF Labs.

A184. The Sackler Family Defendants beneficially own and control all of the entities owned by the Sackler Families, including PF Labs and the Rhodes Defendants, in substantially the same way as they control PPLP and its affiliates, although they may do so using different holding companies and trusts than those used to control PPLP.

A185. At all relevant times, Richard Sackler played an active and central role in the management of Purdue and the Purdue-related business entities. He began working for Purdue as Assistant to the President (his father, Raymond) in the 1970s. He later served as Vice President of Marketing and Sales. In the early 1990s he became Senior Vice President, which was the position he held at the time OxyContin was launched in 1996. In 1999, he became President, and he served in that position until 2003.

A186. Richard Sackler resigned as President in 2003, apparently due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, he continued to serve, with his uncle Mortimer, as Co-Chair of the Board of Purdue. In

that way, among others, the family maintained control over their family business, even though they were no longer officers, because the officers reported to them.

A187. As a senior executive of Purdue, Richard Sackler was actively involved in the invention, development, marketing, promotion, and sale of Purdue's opioid products, including OxyContin. He worked tirelessly to make OxyContin a blockbuster, telling colleagues how devoted he was to the drug's success. Along with his father (Raymond) and his uncle (Mortimer), he launched OxyContin with one of the biggest pharmaceutical marketing campaigns in history, deploying many persuasive techniques pioneered by his uncle Arthur. Within five years of its introduction, OxyContin was generating a billion dollars a year. When OxyContin met with resistance, Richard participated in Purdue's efforts to counter that resistance.

A188. At all relevant times, Richard Sackler served as a trustee of one or more trusts that beneficially own and control Purdue and the Purdue-related business entities.

A189. Richard Sackler is the direct or indirect beneficiary of some portion of 25% of the profits earned by Purdue and the Purdue-related business entities named herein as additional defendants from the sale of opioids.

A190. Jonathan Sackler was a Vice President of Purdue in 1991, and by 2000 he was a Senior Vice President. Like his brother Richard, he resigned that position in or after 2003, apparently due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, he continued to serve on the board of Purdue.

A191. At all relevant times, Jonathan Sackler served as a trustee or one or more trusts that beneficially owns and control Purdue and the Purdue-related business entities.

A192. Jonathan Sackler is the direct or indirect beneficiary of some portion of 25% of the profits earned by Purdue and the Purdue-related business entities from the sale of opioids.

A193. Mortimer D.A. Sackler served as a Vice President of Purdue during the period of the

development, launch, and promotion of OxyContin. He resigned that position in or after 2003, apparently due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, he continued to serve on the Board of Purdue.

A194. Mortimer D.A. Sackler is the direct or indirect beneficiary of 7.14% of the profits earned by Purdue and the Purdue-related business entities from the sale of opioids..

A195. Kathe A. Sackler was a Vice President of Purdue in 1991, and by 2000 she was a Senior Vice President. She resigned that position in or about 2003 due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, she continued to serve on the Board of Purdue.

A196. Kathe A. Sackler is the direct or indirect beneficiary of 7.14% of the profits earned by Purdue and the Purdue-related business entities from the sale of opioids.

A197. Ilene Sackler Lefcourt served as Vice President of Purdue during the period of the development, launch, and promotion of OxyContin. She resigned that position in or after 2003, apparently due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, she continued to serve on the Board of Purdue.

A198. Ilene Sackler Lefcourt is the direct or indirect beneficiary of 7.14% of the profits earned by Purdue and the Purdue-related entities from the sale of opioids.

A199. At all relevant times, Beverly Sackler served as a trustee of one or more trusts that beneficially own and control Purdue and the Purdue-related Additional Defendants and to which 50% of the profits of Purdue and the Purdue-related Additional Defendants from the sale of opioids has been conveyed. She has also served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s. Beverly Sackler is the direct or indirect beneficiary of some portion of 50% of the profits earned by Purdue and the Purdue-related business entities from the sale of opioids.

A200. Theresa Sackler is the direct or indirect beneficiary of 50% of the profits earned by Purdue and the Purdue-related Additional Defendants from the sale of opioids. She also has served as a member of the board of directors of Purdue and Purdue-related business entities since the 1990s.

A201. David A. Sackler is the direct or indirect beneficiary of some portion of 25% of the profits earned by Purdue and the Purdue-related business entities from the sale of opioids. He has also served as a member of the board of directors of Purdue and Purdue-related entities since 2012.

A202. The Sackler Family Defendants, the Sackler Families, and the Richard Sackler Trust, are the sole beneficial owners of Purdue and its associated companies and the Purdue-related business entities. All of Purdue's and its associated companies' profits go to family trusts and business entities dominated and controlled by Sackler Family Defendants.

A203. Richard Sackler, Jonathan Sackler, Mortimer D.A. Sackler, Kathe Sackler, Ilene Sackler Lefcourt, Beverly Sackler, Theresa Sackler, David Sackler, Rhodes Tech, Rhodes Tech Inc., Rhodes Pharma, Rhodes Pharma Inc., the Raymond Sackler Trust (through its trustees), and P.F. Labs each knowingly aided, abetted, participated in, and benefitted from the wrongdoing of Purdue as alleged in the Amended Complaint.

**ii. The Sackler Families and the Development of OxyContin**

A204. The Sackler brothers—Arthur, Mortimer, and Raymond—purchased a small patent-medicine company called the Purdue Frederick Company ("PF Co.") in 1952.

A205. PF Co. had been formed in 1892 by Dr. John Purdue Gray and George Frederick Bingham and incorporated in New York on June 29, 1911.

A206. After Arthur's death, Mortimer and Raymond bought out his share. Since that time PF Co. and its associated companies have all been owned by the Raymond Sackler Family and the Mortimer Sackler Family.

A207. PF Co. is no longer an active New York corporation, having been merged into PF Labs on May 7, 2004.

A208. At all relevant times, PF Co. and PF Labs have been beneficially owned by the Sackler Families and controlled by them through Defendant Sackler Family members.

A209. After the Sackler brothers acquired PF Co. in 1952, they sold products ranging from earwax remover to antiseptic, and it became a profitable business. As an advertising executive, Arthur was not involved, on paper at least, in running the family business because that would have been a conflict of interest. Raymond became the head executive of the family's US business while Mortimer ran the UK side of the business.

A210. Beginning in the 1980s PF Co. and its associated companies engaged in the business of designing, testing, manufacturing, labeling, advertising, promoting, marketing, selling or distributing opioids throughout the United States.

A211. In the 1980s, the Sackler Families, through a UK affiliate, acquired a Scottish drug producer that had developed a sustained-release technology suitable for morphine. PF Co. marketed this extended-release morphine as MS Contin. It quickly became the Sackler Families' best seller. As the patent expiration for MS Contin loomed, the Sackler Families searched for a drug to replace it. Around that time, Richard Sackler had become more involved in the management of the families' businesses. Richard had grand ambitions for the family business; according to a long-time Purdue sales representative, "Richard really wanted Purdue to be big—I mean really big." Richard believed Purdue should develop another use for its "Contin" timed-release system.

A212. In 1990, Purdue's VP of clinical research, Robert Kaiko, sent a memo to Richard and other executives recommending that the company work on a pill containing oxycodone. At the time, oxycodone was perceived as less potent than morphine, largely because it was most commonly prescribed as Percocet, the relatively weak oxycodone-acetaminophen combination pill, or Percodan,

where it was blended with aspirin. By contrast, the oxycodone pill developed by Purdue – OxyContin -- was pure oxycodone in a time-release formula similar to MS Contin, and it was more potent than morphine. Purdue also decided to produce pills with as much as 160 milligrams of oxycodone, far in excess of any other prescription opioid.

A213. OxyContin was created by PF Co., but responsibility for designing, testing, manufacturing, labeling, advertising, promoting, marketing, selling, and distributing OxyContin and other opioid products was shared among PF Co., Purdue, PF Labs, and other Purdue-related companies.

A214. At relevant times, OxyContin was manufactured by PF Labs.

A215. MS Contin had always been limited by the stigma associated with morphine. Oxycodone did not have that problem, and what is more, it was sometimes mistakenly called "oxycodeine," which also contributed to a false perception of relatively lower potency, because codeine is weaker than morphine. Purdue acknowledged using this false perception to its advantage when it eventually pled guilty to criminal charges of "misbranding" in 2007, admitting that it was "well aware of the incorrect view held by many physicians that oxycodone was weaker than morphine" and "did not want to do anything 'to make physicians think that oxycodone was stronger or equal to morphine' or to 'take any steps . . . that would affect the unique position that OxyContin'" held among physicians.

A216. Even though oxycodone did not have the same stigma as morphine, in focus groups conducted before OxyContin's release, Purdue learned that doctors were concerned about the abuse potential of opioids. The focus group concluded that the perceived abuse potential of opioids was the "'biggest negative' that might prevent widespread use of the drug." For Purdue and OxyContin to be "really big," Purdue needed to both distance its new product from the traditional view of narcotic addiction risk, and broaden the drug's uses beyond cancer pain and hospice care. A

marketing memo sent to Purdue's top sales executives in March 1995 recommended that if Purdue could show that the risk of abuse was lower with OxyContin than with traditional immediate-release narcotics, sales would increase. As discussed below, Purdue did not find or generate any such evidence, but this did not stop Purdue from making that claim regardless.

A217. Despite the fact that there has been little or no change in the amount of pain reported in the U.S. over the last twenty years, Purdue recognized an enormous untapped market for its new drug. As Dr. David Haddox, a Senior Medical Director at Purdue, declared on the Early Show, a CBS morning talk program, "There are 50 million patients in this country who have chronic pain that's not being managed appropriately every single day. OxyContin is one of the choices that doctors have available to them to treat that."

**iii. The Sacklers and the Integration of Advertising and Medicine**

A218. Before the defendants in this action began their marketing campaign for prescription opioids, generally accepted standards of medical practice dictated that opioids should only be used short-term, for instance, for acute pain, pain relating to recovery from surgery, or for cancer or palliative care. In those instances, the risks of addiction are low or of little significance. The commercial success of prescription opioids thus would not have been possible without a fundamental shift in prescribers' perception of the risks and benefits of long-term opioid use.

A219. As it turned out, Purdue was uniquely positioned to execute just such a maneuver, thanks to the legacy of Arthur Sackler, the (now-deceased) brother of Raymond and Mortimer Sackler.

A220. 'Arthur Sackler created the pharmaceutical advertising industry as we know it— laying the groundwork for the OxyContin promotion that would make the Sacklers billionaires.

A221. Arthur Sackler, a psychiatrist turned "ad man," was both a psychiatrist and a marketing executive, and, by many accounts, a brilliant and driven man. He pursued two careers

simultaneously, as a psychiatrist at Creedmoor State Hospital in New York and the president of an advertising agency called William Douglas McAdams. Arthur pioneered both print advertising in medical journals and promotion through physician "education" in the form of seminars and continuing medical education courses. He understood the persuasive power of recommendations from fellow physicians, and did not hesitate to manipulate information when necessary. For example, one promotional brochure produced by his firm for Pfizer showed business cards of physicians from various cities as if they were testimonials for the drug, but when a journalist tried to contact these doctors, he discovered that they did not exist.

A222. Arthur Sackler revolutionized medical marketing in the 1950's and 60's by creating the very marketing ploys his family later used to perpetuate the massive fraud alleged in this action. In striving to make Pfizer (with its blockbuster drug, valium) a household name among physicians, Arthur Sackler recognized that "selling new drugs requires a seduction of not just the patient but the doctor who writes the prescription," and he maximized influence over physician prescribing by developing the following marketing ploys to disseminate pharmaceutical messaging to the masses under the guise of science and truth: a. contacting prescribers directly with a variety of perks, benefits and even job offers; b. publishing seemingly neutral articles in medical journals, citing scientific studies (frequently underwritten by the pharmaceutical companies whose products he was marketing); c. marketing illnesses (i.e., lamenting and marketing the under treatment of purported illnesses and the corresponding under-utilization of drugs he was promoting); d. paying prominent physicians to endorse his products; and e. funding continuing medical education programs ("CME's"), controlling the messaging of key opinion leaders, and maximizing influence over physician prescribing practices.

A223. In the 1960s, Purdue made Valium into the first hundred-million dollar drug, so popular it became known as "Mother's Little Helper." His expertise as a psychiatrist was one of the

keys to his success. When Arthur's client, Roche, developed Valium, it already had a similar drug, Librium, another benzodiazepine, on the market for treatment of anxiety. So Arthur invented a condition he called "psychic tension"— essentially stress—and pitched Valium as the solution. The campaign, for which Arthur was compensated based on volume of pills sold, was a remarkable success.

A224. In marketing tranquilizers Librium and Valium, Purdue broadened his customer base to potentially include everyone. For example, one campaign encouraged doctors to prescribe Valium to people with no psychiatric symptoms whatsoever, urging doctors to "consider the usefulness of Valium" in patients with no demonstrable pathology. Such marketing led one physician, writing in the journal Psychosomatics in 1965, to ask, "When do we not use this drug?'"

A225. As the line between medical education and medical marketing became very deliberately blurred, Valium became the pharmaceutical industry's first hundred-million-dollar, and then billion-dollar, drug. For Arthur Sackler's efforts in designing and creating these wildly-successful medical marketing strategies, he was posthumously inducted into the Medical Advertising Hall of Fame, but as succinctly put by Allen Frances, the former chair of psychiatry at Duke University School of Medicine: "'Most of the questionable practices that propelled the pharmaceutical industry into the scourge it is today can be attributed to Arthur Sackler.'"

A226. In other precursors of the current crisis, Purdue promoted these drugs despite the lack of any studies of their addictive potential. Additionally, Arthur Sackler started his own newspaper, the Medical Tribune, despite concerns that a pharmaceutical advertiser should not be publishing a medical periodical directed at doctors. Purdue paid Key Opinion Leaders ("KOLs"), including for example, Henry Welch (then chief of FDA's antibiotics division), almost $300,000 in exchange for his help in promoting pharmaceutical drugs. By the 1970's, doctors were prescribing more than 100 million tranquilizer prescriptions annually, creating what Sen. Edward Kennedy

called "a nightmare of dependence and addiction."

**iv. Purdue's Directors Knew About, and Participated in, Purdue's Wrongdoing**

A227. The members of the board of Purdue were intimately involved in the activities of the entities that they managed, often on a weekly or even daily basis.

A228. Purdue, PF Co., PF Labs, and the Sackler Families launched OxyContin with one of the biggest pharmaceutical marketing campaigns in history, deploying many persuasive techniques pioneered by Arthur. They trained and armed a force of approximately 1,000 sales representatives with charts showing OxyContin's purported benefits. A major thrust of the sales campaign was that OxyContin should be prescribed not merely for the kind of severe short-term pain associated with surgery or for cancer pain but also for less acute, longer-lasting pain, such as arthritis, back pain, sports injuries, fibromyalgia. The number of conditions that OxyContin could treat was, according to defendants, unlimited.

A229. The training included "training in 'overcoming objections' from clinicians." "If a doctor inquired about addiction," the representative was instructed to respond thus: "'The delivery system is believed to reduce the abuse liability of the drug.'" Another sales representative said that Purdue executives "told us to say things like: "it is 'virtually' non-addicting."

A230. Purdue sales representatives were provided with studies and literature provided by other physicians. Purdue had a speakers' bureau through which it paid several thousand doctors to attend medical conferences and deliver presentations about OxyContin's merits. "Doctors were offered all-expenses-paid trips to pain-management seminars in places like Boca Raton." Internal documents reflect that doctors who attended these seminars wrote OxyContin prescriptions more than twice as often as those who didn't.

A231. Purdue also advertised in medical journals and produced promotional videos featuring not just satisfied patients but also doctor's testimonials. "The marketing of OxyContin

relied on an empirical circularity: the company convinced doctors of the drug's safety with literature that had been produced by doctors who were paid, or funded, by the company." According to a former OxyContin sales representative, Richard Sackler was "'the dude that made it happen.'" Richard Sackler himself was tireless in his dedication to OxyContin's success. When benefit plans began citing OxyContin abuse as an excuse not to pay, Richard Sackler sent an email to sales representatives stating that, for insurers, "'addiction' may be a convenient way to just say 'NO.'"

A232. Members of the Sackler family were daily on site at Purdue's headquarters, controlling the management of their family business and all of its employees.

A233. Richard Sackler is named as inventor on some 50 patents relating to oxycodone and other pain medications, including several patents apparently issued as late as 2016. Virtually all such patents invented by Richard Sackler were assigned to Purdue.

A234. In 1997, both Richard and Kathe Sackler were part of a conspiracy to deceive physicians into believing that oxycodone was half as strong as morphine, when in fact the opposite was true; this deception was known by Purdue to ease the fears of well-meaning and careful physicians about prescribing OxyContin for non-cancer pain uses.

A235. In the late 1990s Richard, Jonathan and Kathe Sackler participated in an unlawful attempt to deceive European drug regulators into classifying OxyContin as totally uncontrolled, i.e., capable of being obtained without a prescription, despite the fact that all of these family members were by then well aware of the abuse liability of the drug in the U.S.

A236. In 2001, Kathe Sackler attended a talk given by the chief medical officer of Sikorsky Aircraft, in which the speaker expressed grave concern about the risks associated with OxyContin; instead of acknowledging this fact to the medical officer, Kathe Sackler instead remained silent and returned to the Purdue headquarters, where employees were directed to find ways to undercut and deflect the Sikorsky medical officer's concerns.

A237. In the period around 1999-2003, Purdue developed a method to cause company emails to self-destruct at a pre-determined time; this was an attempt to create a system where potentially incriminating documents would automatically self-destruct, even after receipt by unrelated third-parties. Richard, Jonathan and Kathe Sackler all were directly aware and supportive of this project.

**v. Members of the Sackler Families Were Aware of Risks Associated with OxyContin No Later than the Summer of 1999**

A238. That prescription opioids would lead to addiction, and specifically that OxyContin could be, and was being, abused has been known to Purdue and to the members of the Sackler Families involved in running the family business since at least the summer of 1999.

A239. In summer of 1999, a Purdue sales representative wrote to the President of Purdue reporting widespread abuse of OxyContin. As a result of that memo, a secretary at Purdue, Maureen Sara, was tasked with doing research on the Internet to learn about the nature and scope of the abuse, specifically to learn about how recreational drug users were misusing OxyContin.

A240. In order to carry out her assignment, Ms. Sara began visiting drug-user Internet "news groups" or "chat rooms" on a daily basis. Two groups in particular that Ms. Sara visited were ‘alt.drugs’ and ‘alt.drugs.hard’. For a period of time, from late-summer and early fall of 1999, Ms. Sara would forward screen shots from these news groups on a daily basis to Howard Udell, then General Counsel of Purdue.

A241. In October or November, 1999, Ms. Sara prepared a memo summarizing her research into misuse of OxyContin. The memo described how users would remove the coating on the OxyContin pills, crush them, cook them, and snort or shoot them. Ms. Sara sent the memo containing the details of OxyContin abuse by drug users not only to the President of Purdue and to its General Counsel, but also to Purdue's then-medical director, and directly to members of the

Sackler Families involved in the management of the company, including Richard Sackler, Jonathan Sackler, and Kathe Sackler.

A242. Purdue, Richard Sackler, Jonathan Sackler, and Kathe Sackler were thus all aware of the risk and abuse potential and reality of OxyContin long before Purdue acknowledged the same to government, the healthcare community or the public. In sworn testimony before the U.S. House of Representatives in 2001, Purdue President Michael Friedman, in the presence of Purdue General Counsel Howard R. Udell, swore that the first the companies knew of widespread abuse of OxyContin was in the year 2000. This was, of course, patently inconsistent with what the members of the Sackler Families knew from the Sara memo they had received in 1999. No member of the Sackler Families at any time tried to correct the false narrative promulgated far and wide about the abuse liability of OxyContin, nor corrected the false statement about when Purdue became aware of this problem with the drug.

A243. Richard Sackler, Kathe Sackler, Jonathan Sackler, Theresa Sackler, Mortimer D.A. Sackler and Ilene Sackler have, individually or in combination, been aware since at least 1999 of potential liability for Purdue, and those acting in concert with Purdue, because of the addictive nature of OxyContin. With the intention of shielding from creditors the proceeds of their wrongdoing, they have stripped out of Purdue and the Purdue-related Additional Defendants each and every year hundreds of millions of dollars of profits from the sales of OxyContin and other opioid-containing medications, including a generic form of OxyContin sold by Rhodes Pharma. All such transfers were and are fraudulent within the meaning of applicable fraudulent transfer statutes and case law; all such transfers unjustly enriched the recipients; and all such transferred funds should be clawed back from the Sackler Defendants (i.e., the "Trust For the Benefit of Members of the Raymond Sackler Family", the "Sackler Family Defendants" and "Sackler Families") as well as from all other named individual defendants that had served as officers or board members of the following

defendants: the Purdue Entities, Rhodes Technologies, Rhodes Technologies Inc., Rhodes Pharmaceuticals L.P., Rhodes Pharmaceuticals Inc., and P.F. Laboratories, Inc., as well as the recipient of 50% of the profits from the sale of opioids by Purdue and Purdue Entities, Rhodes Technologies, Rhodes Technologies Inc., Rhodes Pharmaceuticals L.P. , Rhodes Pharmaceuticals Inc. and P.F. Laboratories, Inc.in order to satisfy the opioid-related liabilities of the companies from which they were transferred.

**vi. Purdue-Related Business Entities Continued to Oversee Purdue's Wrongdoing Even after Purdue Was Fined and Warned about Its Conduct**

A244. From 2001 to 2007, Purdue was investigated by 26 states and the U.S. Department of Justice. Beginning in or about 2003, advised by Stuart Baker, who served as legal counsel to the entire Purdue organization and the Sackler Families, all of the Sacklers who served as executive officers of Purdue resigned out of concern that they might be held personally liable for conduct on behalf of Purdue in which they had previously engaged and in which they expected and intended to continue to engage after their respective resignations.

A245. In 2007, PFC agreed to pay nearly $700 million and pleaded guilty to a felony for misleading doctors and patients about opioids. Purdue admitted that its supervisors and employees, "with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications." At the same time, Purdue executive officers Michael Friedman (the CEO), Howard Udell (Vice President and General Counsel), and Paul Goldenheim (Chief Medical Officer) pleaded guilty to criminal charges that they let Purdue deceive doctors and patients about its opioids.

A246. As part of the plea agreement in 2007, Purdue agreed to a detailed Corporate Integrity Agreement with the U.S. government. The Agreement required Purdue to appoint a Compliance Officer who would "be a member of senior management of Purdue," "make periodic

(at least quarterly) reports regarding compliance matters directly to the Board of Directors," and "be authorized to report on such matters to the Board of Directors at any time." The Corporate Integrity Agreement was built on the idea that the directors would ensure that Purdue never deceived doctors and patients again.

A247. The Corporate Integrity Agreement included the directors as "Covered Persons" from 2007 through 2012. All Covered Persons, including the directors and CEO, were required to comply with rules that prohibit deception about Purdue opioids. The directors were required to undergo hours of training to ensure that they understood the rules. The directors were required to report all violations of the rules. The directors were warned that they could face consequences if they failed to comply with the rules. The directors certified that they had read and understood the rules and would comply with them.

A248. The directors were acutely aware of their obligations under the Corporate Integrity Agreement because, in 2009, Purdue had to report to the Inspector General of the U.S. Department of Health and Human Services that it had not immediately trained a new director on the Agreement. Purdue reported: "a new Director was appointed to Purdue's Board of Directors, without timely notice to either Corporate Compliance or the Office of General Counsel, as otherwise required by policy, resulting in failure to timely launch the training assignment to this new Board member." Purdue assured the U.S. government that it had trained the new director: "Relevant personnel were reminded of existing policy to notify Corporate Compliance and the Office of General Counsel of changes to the Board of Directors. In both instances, these individuals completed their training assignments within 1 day of Corporate Compliance learning of this issue." Purdue promised the government that the director's training had addressed "the proper methods of promoting, marketing, selling, and disseminating information about Purdue's products," so Purdue would never deceive doctors and patients again.

A249. Every year since the 2007 guilty plea and Corporate Integrity Agreement, Purdue's directors received warning signs about Purdue's ongoing misconduct and opportunities to stop it.

A250. In 2008, more Americans died from opioid overdoses than ever before.

A251. In 2009, the American Journal of Public Health published an article about Purdue's opioid marketing entitled, "The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy." The article detailed Purdue's use of sales representatives, targeting of high-prescribers, and deception about addiction. That same year, CDC reported that deaths from opioids had recently tripled. In 2010, Time magazine published a story about Purdue's opioids entitled, "The New Drug Crisis: Addiction by Prescription." Overdoses were the leading cause of accidental death in 15 states. By the spring of 2010, Purdue's directors had been told that Purdue could not get product liability insurance to cover OxyContin.

A252. In 2011, the White House announced that prescription drug abuse was the nation's fastest-growing drug problem and called for "educating healthcare providers about prescription drug abuse … so they will not over-prescribe[.]" The CDC announced that prescription opioid overdoses had reached epidemic levels and called out Purdue's opioids by name. That same year, Fortune magazine interviewed Purdue executives, including Vice President Alan Must. Fortune published a story about Purdue, the Sackler Families, and evidence that they profited from opioid addiction. Mr. Must admitted that Purdue was "well aware" of concerns about its conduct: "We are well aware of detractors. For those individuals who think we're evil … I don't think there's anything we can do that is going to change their opinion."

A253. In 2012, the U.S. Senate launched an investigation into whether Purdue was deceiving doctors and patients about opioids. In a letter to the CEO of Purdue, the Senators warned of "an epidemic of accidental deaths and addiction resulting from the increased sale and use of powerful narcotic painkillers." The Senate letter warned Purdue specifically of the danger of

patients taking higher doses: "over the last decade, the number of prescriptions for the strongest opioids has increased nearly fourfold, with only limited evidence of their long-term effectiveness or risks while data suggest that hundreds of thousands of patients nationwide may be on potentially dangerous doses." The Senate letter also warned about Purdue misleading doctors and patients: "There is growing evidence pharmaceutical companies that manufacture and market opioids may be responsible, at least in part, for this epidemic by promoting misleading information about the drugs' safety and effectiveness." The Senate put the directors on notice that they were under scrutiny, demanding that Purdue produce to investigators a set of "presentations, reports, and communications to Purdue's management team or board of directors from 2007 to the present."

A254. In 2013, the Los Angeles Times revealed that Purdue had been compiling a list for the past decade of 1,800 doctors suspected of recklessly prescribing its opioids, but Purdue had reported only 8% of them to authorities. Purdue attorney Robin Abrams gave multiple interviews to the newspaper. Abrams was a Vice President of Purdue, and she signed Purdue's 2007 settlement agreement. In 2013, she admitted that Purdue had the list, and said Purdue would not agree to disclose it to authorities because, "I don't really want to open up an opportunity for folks come in here and start looking and second-guessing."

A255. Abrams and Purdue's directors knew they had reason to fear scrutiny. The state of Kentucky was prosecuting a lawsuit against Purdue for deceiving doctors and patients about opioids. Purdue's lawyers surveyed residents who could be on the jury. One-third knew someone who overdosed or was seriously hurt taking a Purdue opioid, and 29 percent knew someone who died. Purdue itself filed those statistics in court.

A256. In 2014, Edward Mahony, the Executive Vice President, CFO, and Treasurer of Purdue stated that the Kentucky lawsuit was so significant that it could jeopardize "Purdue's long-term viability." That same year, the Governor of Massachusetts declared the opioid crisis a public

health emergency.

A257. In 2016, the CDC published the CDC Guideline for Prescribing Opioids for Chronic Pain to try to stop dangerous opioid prescribing.

A258. In 2017, the President of the United States declared the opioid crisis a national public health emergency.

A259. PPI's directors, including Sackler Family Defendants, either knew or should have known about these warnings and many others.

A260. The Sackler Family Defendants oversaw Purdue's scheme to send sales representatives to visit doctors thousands of times. They oversaw Purdue's scheme to hire top prescribers to promote its opioids. They oversaw Purdue's effort to get more patients on higher doses of opioids for longer periods. They were aware of, allowed and directed the content of the messages conveyed in Purdue's marketing.

A261. The quarterly reports distributed to the directors of PPI demonstrate that the directors in fact controlled both PPI and PPLP and, upon information and belief, PPPI and PPTI. The reports and minutes make clear that the directors of PPI were kept fully informed of the activities of Purdue in the areas "Finance," "Sales & Marketing," "Manufacturing & Supply Chain," "Quality," "Research & Development," "Discovery Research," "Licensing & Business Development," "Corporate Compliance," "External Affairs," "Health Policy," "Human Resources," and "Information Technology" — all of which were overseen by the directors.

A262. Richard Sackler testified that the sales representatives were the main way that Purdue promoted its opioids. He testified that the key to getting doctors to prescribe and keep prescribing Purdue opioids was regular visits from the sales force. The board tracked the exact number of sales representatives and the exact number of visits they made to urge doctors to prescribe Purdue opioids. The board knew which drugs were promoted; how many visits sales representatives

averaged per workday; how much each visit cost Purdue; and the company's plan for sales visits in each upcoming quarter. The Board approved specific plans to hire new sales representatives, hire and promote new District and Regional managers, and create sales "territories" in which representatives would target doctors.

A263. The directors, which included Sackler Family Defendants, oversaw the tactics that sales representatives used to push opioids. A board report analyzed a Purdue initiative to use iPads during sales visits, which increased the average length of the sales meeting with the doctor to "16.7 minutes in front of the customer.

A264. The directors, which included Sackler Family Defendants, oversaw promotional claims that representatives presented to doctors during sales visits. They received reports, for example, that a "review of call notes" recorded by Purdue sales representatives "suggested potential comparative claims of superiority of Purdue products relative to competitors," and deceptive promotion of opioids as treatment for "minor pain," including hundreds of examples of deceptive marketing that required "extensive remedial actions." The directors oversaw Purdue's research, including research that contradicted its marketing. The board received reports about studies of Purdue opioids in "opioid-naïve" patients and patients with osteoarthritis, down to the details of the strategy behind the studies and the enrollment of the first patients.

A265. The directors, which included Sackler Family Defendants, oversaw Purdue's improper response to signs of "abuse and diversion" by high-prescribing doctors. The board was told exactly how many "Reports Of Concern" Purdue sales representatives submitted to the company about doctors they had visited to promote opioids (572 Reports Of Concern in the July 2007 board report); how many "field inquiries" Purdue had decided to conduct in response to the reports (21 inquiries in response to 572 Reports Of Concern); and even that six Reports Of Concern were submitted in Massachusetts.

A266. The directors, which included Sackler Family Defendants, even monitored sales representatives' emails. Purdue held thousands of face-to-face sales meetings with doctors, but the company prohibited its sales representatives from writing emails to doctors, which could create evidence of Purdue's misconduct. When Purdue found that some sales representatives had emailed doctors, the company conducted an "investigation" and reported to the board that sales representatives had been disciplined and that their emails would be discussed at the board meeting.

A267. The directors, which included Sackler Family Defendants, also oversaw Purdue's strategy to pay high prescribers to promote Purdue opioids. A report for the board listed the exact number of conferences and dinner meetings, with attendance figures, and assured the directors: "We are tracking the prescribing trends of these attendees following the programs and will report the results in future reports." The board was told the amounts paid to certain doctors, and they received detailed reports on the Return on Investment that Purdue gained from paying doctors to promote its drugs. The board was told that Purdue would allow a "spending limit for gifts" of $750 per doctor per year; and that the directors should personally report when they gave money, meals, or gifts to doctors to promote Purdue drugs. The board was told explicitly that paying doctors to promote opioids was "a high-risk activity, in view of the potential for off-label or other improper promotional conduct by third parties during such activities." When Congress required disclosure of drug company payments to doctors, the board was told there were "significant compliance implications" for Purdue.

A268. The directors, which included Sackler Family Defendants, also oversaw Purdue's strategy to push patients to higher doses of opioids — which are more dangerous, more addictive, and more profitable. The board routinely received reports on Purdue's effort to push patients to higher doses. A report alerted the board that "Net sales of the 40 and 80 mg strengths of OxyContin" had fallen below Purdue's targets in the fall of 2010 and were $85 million below budget.

By summer, the board learned that income was $500 million below budget "mainly due to declining sales in 40 mg and 80 mg strengths. By fall, the board reviewed an assessment that Purdue had lost more than $800 million in revenue because patients weren't taking enough 40 mg and 80 mg doses. The board dug into the issue. Multiple reports to the board identified as a "threat" an initiative by public health authorities to save lives by requiring doctors to consult with pain specialists before prescribing opioid doses higher than 80mg/day. The CEO and directors oversaw Purdue's effort to push back against that public health "threat." Executives were pleased to report to the directors in 2013 that "initiatives to validate increased total daily doses are having impact in the field."

A269. The directors, which included Sackler Family Defendants, also oversaw Purdue's scheme to use higher doses of opioids to keep patients on drugs for longer periods of time. The board received detailed reports of how many patients stayed on Purdue's opioids for long periods (for example, longer than 35 days), along with Purdue's internal research showing that getting patients on higher doses keeps them on the drugs longer — all of which puts patients at greater risk of addiction and death. The board received the confidential results of a study of 57,000 patients that Purdue performed explicitly to determine how opioid dose "influences patient length of therapy." The results showed that patients on the highest doses "are the most persistent." The "Recommended Actions" presented to the board included "additional workshops for the sales force" and "specific direction" to the sales representatives about using higher doses to keep patients on drugs longer.

A270. The board, which included Sackler Family Defendants, was told in writing that encouraging higher doses "is a focal point of our promotion," and that sales representatives would "emphasize the importance" of increasing patients' opioid doses, as soon as 3 days after starting treatment. The board even tracked specific sales materials, such as "two new patient profiles designed to improve patient identification and titration" – to get more opioid-naïve and elderly

patients on higher doses of opioids for longer periods of time. The board was told the exact research behind the sales strategy: higher doses would keep patients on drugs longer because Purdue had found that "83% of patients who discontinued were never titrated to higher doses." The directors knew or should have known that Purdue's sales strategy was deceptive and that putting patients on opioids at higher doses and for longer periods increased the risk of addiction, overdose, and death.

A271. The directors, which included Sackler Family Defendants, also oversaw Purdue's strategy of using "savings cards" to get patients on Purdue opioids for longer periods. The board knew how many thousands of cards were used each quarter, how the company calculated the Return On Investment, and that the explicit goal of the program was to hook patients to "remain on therapy longer."

A272. The directors, which included Sackler Family Defendants, also oversaw Purdue's strategy to target prescribers who did not have special training in opioids (primary care doctors, nurse practitioners, and physician assistants) because they "show the highest responsiveness" to Purdue's sales push. Purdue continued that strategy even though the DEA had expressed concern that Purdue was promoting opioids to clinicians who were not adequately trained in pain management. The directors also oversaw Purdue's strategy to target elderly patients by promotion "targeted to HCPs that practice in the long-term care setting," even down to the details of advertising that "leverages images of older patients." The directors knew or should have known that Purdue's sales strategy was deceptive and that targeting primary care doctors and elderly patients increased the risk of addiction, overdose, and death.

A273. The directors, which included Sackler Family Defendants, also oversaw Purdue's push to steer patients away from safer alternatives. They tracked the company's effort to emphasize "the true risk and cost consequence of acetaminophen-related liver toxicity." The board even oversaw Purdue's deceptive websites and received reports about the specific section that was found

to be deceptive by the New York Attorney General.

A274. The directors, which included Sackler Family Defendants, also oversaw Purdue's response to signs that patients were being harmed. Reports of harm came in by the hundreds and even thousands. One board report explained that "in excess of 5,000 cases with alleged adverse events have already been received and processed by Drug Safety and the Litigation Support group" during a single quarter.

A275. Each of the reports described above was, upon information and belief, sent to the attention of the Sackler family members on the Purdue's board at the time they were prepared.

## ADDITIONAL ALLEGATIONS AGAINST ALL DEFENDANTS

### A. Neonatal Abstinence Syndrome

A276. Some victims of the Opioid Crisis are babies born with Neonatal Abstinence Syndrome ("NAS"), a condition suffered by babies of mothers addicted to opioids. It is suspected that NAS babies experience DNA changes at the cellular level, particularly in the tissues of the brain and nervous system, and may suffer lifelong afflictions as a result of maternal use of prescription opioid medications during gestation. These patients often require extensive care because they are likely to experience lifelong mental health problems, developmental impairment, and physical health limitations.

A277. Recently, there has been a dramatic increase in the number of fetuses that have been exposed to opioids. Women are also victims of the opioid epidemic, and health care for opioid exposed mothers and their babies is a major factor in the nation's rising unreimbursed healthcare costs.

A278. The number of infants born suffering from this insidious condition is staggering. The incidence of NAS in the United States grew five-fold between 2000 and 2012. Specifically,

cases of NAS increased nationally from a rate of 1.2 per 1000 hospital births per year in 2000 to 5.8 per 1000, with a total of 21,732 infants diagnosed by 2012. Currently, the best estimates are that a child with NAS is born every 25 minutes, perhaps every 15 minutes.

A279. In 2011, The Substance Abuse Mental Health Services Administration reported that 1.1% of pregnant women abused opioids (0.9% used opioid pain relievers and 0.2% used heroin).

A280. In 2014, the number of babies born drug-dependent had increased by 500 percent since 2000, and children being placed in foster care due in part to parental drug abuse are going up — now it is almost a third of all child removals.

A281. Heroin and other opioid misuse during pregnancy are also associated with increased risks and incidence of placental abruption, preterm labor, maternal obstetric complications, maternal mortality, and fetal death.

A282. NAS-diagnosed children "are at increased risk for neuropsychological function." The challenges presented to them and their caregivers at birth are summarized as: "Do they catch up, remain at a disadvantage, or do they proceed to function even more poorly than their peers over time?" Unfortunately, the new research borne about as a result of the Opioid Epidemic reveals that all children exposed to opioids and other drugs *in utero* are at a substantially higher risk for lower mental abilities and more signs of attention deficits," and that these effects will persist or worsen through adolescence."

A283. Specifically, children diagnosed with NAS exhibit:

- by age 1: diminished performance on the Psychomotor Development Index, growth retardation, poor fine motor skills, short attention span, intellectual performance;
- between ages 2-3: significantly lower cognitive abilities, including lower motor development, lower IQ, and poor language development;
- between ages 3-6: significant detrimental impact on self-regulation, including

aggressiveness, hyperactivity, lack of concentration, lack of social inhibition, lower IQs (8-15 point difference), poor language development, and behavioral and school problems; and

- after 8.5 years: significantly greater difference in cognitive scores than at previous ages, especially in girls.

A284. While the pathophysiological mechanism of opioid withdrawal in neonates is currently not known, several factors can affect the accumulation of opioids in the fetus. Opiate drugs have low molecular weights, are water soluble, and are lipophilic substances; hence, they are easily transferable across the placenta to the fetus. It is known that the transmission of opioids across the placenta increases as gestation increases. It is also known that synthetic opiates cross the placenta more easily compared with semisynthetic opiates. The combination of cocaine or heroin with methadone further increases the permeability of methadone across the placenta. Together, the ease with which these drugs can cross the blood-brain barrier of the fetus, and the prolonged half-life of these drugs in the fetus may worsen the withdrawal in infants. Neonatal abstinence syndrome is the end result of the sudden discontinuation of prolonged fetal exposure to opioids.

A285. NAS babies' mothers purchase and consume prescription opioids from one or more Defendants, directly or foreseeably but indirectly, or obtain them from other sources. Each minor child suffers, and will suffer, lifelong mental illness, mental impairment, and loss of mental capacity. The minor child's entire health, use of the child's body and mind, and life, including the minor child's ability to live normally, learn and work normally, enjoy relationships with others, and function as a valuable citizen, child, parent, income-earner, and person enjoying life, are compromised, and permanently impaired.

A286. Plaintiff's experience is part of an opioid epidemic sweeping through the United States and Missouri, causing thousands of infants great suffering and continuing developmental physical, medical, occupational, and psychological issues. This epidemic is reportedly the largest

health care crisis in U.S. history. Plaintiffs bring this class action to eliminate the hazard to public health and safety caused by the opioid epidemic and to abate the nuisance caused by Defendants' false, negligent and unfair marketing and/or unlawful diversion of prescription opioids. Plaintiffs further seek equitable relief in the form of medical monitoring, in order to provide this class of infants with monitoring of developmental issues confronting them as they mature, in addition to equitable relief in the form of funding for services and treatment. The ongoing and robust medical monitoring and treatment of opioid-related NAS-diagnosed children is medically necessary. Further, this is a rapidly transforming field, as multiple members of multiple disciplines and support systems, ranging from medical providers to psychologists to behavioral therapists to child care providers, are coming together to determine the best protocols for improving the outcomes after a diagnosis.

A287. The ongoing and robust medical monitoring and treatment of opioid-related NAS-diagnosed children is medically necessary. Medical monitoring is a rapidly transforming, as multiple members of multiple disciplines and support systems, ranging from medical providers to psychologists to behavioral therapists to child care providers, are coming together to determine the best protocols for improving the outcomes after a diagnosis. Programs in some areas offer, for example, a view of necessary treatment components after hospital discharge: (1) education of caregivers for techniques to relieve infant distress, including infant massage, calming techniques, and other coping skills; (2) education of caregivers about NAS and the associated symptoms; (3) frequent follow-up of the infant for growth and weight gain; (4) monthly development evaluations during infancy and toddler years to determine whether additional interventions and treatment are necessary.

A288. Neonatal exposure to opioids necessarily results in medical needs that exist throughout the entire period of a child's adolescent development. These needs absolutely exist, regardless of the dosage any one child received prenatally or how he or she was weaned from these substances. These needs relate primarily to the well-known adverse effect of opioids on behavioral

and regulatory development in exposed children. Every single child diagnosed with opioid-related NAS must have robust medical testing, monitoring, intervention, provision of caregiver training and information, and medical referral in order to maximize his or her future as an adult. This relief will also largely abate the public nuisance created by Defendants' conduct. For this reason, Plaintiff and the class seek, inter alia, injunctive relief.

**B. Discovery Rule and Tolling**

A289. The Defendants' unfair and deceptive conduct was well concealed, and only recently uncovered through exhaustive investigation and research. The defendants deliberately conducted much of their deception through in-person sales visits, in order to avoid generating a potentially discoverable paper trail of their misconduct. In the case of defendant Purdue, it is alleged to have prohibited its sales reps from emailing doctors regarding its opioids. The defendants also concealed from the general public their internal communications about their deceptive course of conduct, including their plans to hook more patients on higher doses for longer periods and, separately, their knowledge of inappropriate prescribing by high-prescribing doctors that they had targeted to prescribe their opioids.

A290. Discovering the nature and extent of the defendants' unfair and deceptive conduct has been a time-consuming and complex process, further strained by defendants' lack of cooperation and baseless denials. Due to Defendants' deception, any statutes of limitation otherwise applicable to any claims asserted herein against all defendants have been tolled by the discovery rule and rules regarding fraudulent concealment.

WHEREFORE, Plaintiff prays for relief as set forth in Plaintiff's Existing Complaint as has been supplemented and amended herein.

Date: March 16, 2019

Respectfully submitted by:

/s/ Celeste Brustowicz
Celeste Brustowicz (pro hac vice pending)
Barry J. Cooper, Jr. (pro hac vice pending)
Stephen H. Wussow (pro hac vice pending)
Victor Cobb (pro hac vice pending)
Cooper Law Firm, LLC
1525 Religious Street
New Orleans, LA 70130
Telephone: 504-399-0009
Email: cbrustowicz@sch-llc.com

Anthony D. Gray
Attorney at Law
Johnson Gray, LLC
319 North 4th Street, Suite 212
St. Louis, MO 63102
314.385.9500 bus
314.594.2052 fax
Email: agray@johnsongraylaw.com

James F. Clayborne (Bar No. 45627)
CLAYBORNE, SABO & WAGNER, LLP
525 West Main Street, Suite 105
Belleville, IL 62220
Telephone: 618-239-0187
Facsimile: 618-416-7556
Email: jclayborne@cswlawllp.com

Kevin W. Thompson (pro hac vice pending)
David R. Barney, Jr. (pro hac vice pending)
Thompson Barney Law Firm
2030 Kanawha Boulevard, East
Charleston, WV 25311
Telephone: 304-343-4401
Facsimile: 304-343-4405
Email: kwthompsonwv@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of March, 2019, a copy of the above and foregoing has been electronically filed with the Clerk of Court using the CM/ECF system, which provides an electronic service notification to all counsel of record registered as CM/ECF users.

/s/ STEPHEN H. WUSSOW